**VACATE; and Opinion Filed July 15, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00901-CR

### THE STATE OF TEXAS, Appellant
### V.
### ANGELA DAWN CLAMPITT, Appellee

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-81729-2014**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Myers

Angela Dawn Clampitt was charged with two counts of endangering a child involving her two children, C.C. and B.C. The jury acquitted her in the case involving C.C. but convicted her in the case involving B.C. The trial court sentenced Clampitt by agreement to two years in state jail suspended for four years. Clampitt then filed a motion for new trial alleging insufficiency of the evidence, which the trial court granted. The State subsequently brought this appeal, alleging the trial court erred by granting a new trial on the grounds of legal insufficiency. For the reasons that follow, we vacate the trial court's order and reinstate the judgment of conviction and sentence.

### DISCUSSION

The State's sole point of error on appeal is that the trial court erred by granting a new trial on the basis of insufficient evidence. The indictment alleged that on or about March 1, 2014, in

Collin County, Texas, appellee did:

> then and there intentionally, knowingly, recklessly, or with criminal negligence, engage in conduct that placed [B.C.], a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by failing to adequately supervise [B.C.];
>
> then and there intentionally, knowingly, recklessly, or with criminal negligence, engage in conduct that placed [B.C.], a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by being impaired while having sole responsibility for the care of [B.C.];
>
> then and there intentionally, knowingly, recklessly, or with criminal negligence, engage in conduct that placed [B.C.], a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by attempting to operate a motor vehicle occupied by [B.C.] while impaired[.]

The State contends the evidence was sufficient to conclude appellee placed B.C. in imminent danger of death, bodily injury, or physical or mental impairment . *See* TEX. PENAL CODE ANN. § 22.041(c). The State claims she was heavily intoxicated when she took four-year-old B.C. swimming, left B.C. to swim with only her nine-year-old brother to supervise her, and attempted to drive a car with B.C. inside while falling over her and passing out repeatedly. Furthermore, the State asserts that although B.C. was not actually injured, the danger was imminent from appellee's actions and that her acquittal in the companion case involving C.C. does not affect the sufficiency of the evidence.

The Texas Penal Code states that a person commits an offense if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." *Id*. The word "imminent" is not defined in the penal code, but the Texas Court of Criminal Appeals has defined the term to mean "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." *Garcia v. State*, 367 S.W.3d 683, 689 (Tex. Crim. App. 2012) (quoting *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (internal quotation marks omitted)); *see also Millslagle v. State*, 81 S.W.3d

–2–

895, 898 (Tex. App.—Austin 2002, pet. ref'd) (same). It is insufficient that the accused placed the child in a situation that is potentially dangerous. *Millslagle*, 81 S.W.3d at 898. "[T]o be 'imminent' for [the purpose] of imposing responsibility pursuant to Penal Code § 22.041(c), the situation must be immediate and actual, not potential or future, at the moment of the act or omission by the defendant." *Newsom v. B.B.*, 306 S.W.3d 910, 918 (Tex. App.—Beaumont 2010, pet. denied). "[T]he danger must be imminent at the moment the defendant engages in the conduct." *Id.*

A trial court's ruling on a motion for new trial is reviewed under an abuse of discretion standard. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). The evidence must be viewed in the light most favorable to the ruling, and the reviewing court will presume the trial court made all reasonable factual findings against the losing party that are supported by the record. *Id.* When deciding a motion for new trial on the grounds of legal sufficiency, the trial court applies the appellate legal sufficiency standard. *State v. Chavera*, 386 S.W.3d 334, 336–37 (Tex. App.—San Antonio 2012, no pet.); *State v. Provost*, 205 S.W.3d 561, 567 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The trial court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Chavera*, 386 S.W.3d at 336–37; *see also Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). If the evidence meets this standard, it is an abuse of discretion for the trial court to grant the motion for new trial. *Chavera*, 386 S.W.3d at 336–37. The court may not act as a thirteenth juror or substitute its beliefs for those of the jury, and it is required to defer to the jury's determinations of the credibility and weight to be given to the witnesses' testimony. *Brooks*, 323 S.W.3d at 899; *Chavera*, 386 S.W.3d at 337.

The record shows that on the morning of Saturday, March 1, 2014, Mark Clampitt

dropped off for the weekend his two children, nine-year-old C.C. and four-year-old B.C., with their mother, appellee, Clampitt's ex-wife. Appellee took the children to a nearby hotel where a friend, Ben Mitchell, was staying so the children could swim in the hotel pool. Mitchell testified that they went to his room first, where the children ate snacks and Mitchell and appellee drank vodka mixed with cranberry juice. Earlier that morning, before picking up her children, appellee had taken a Xanax, according to Mitchell. Mitchell also recalled that before they went down to the pool area with the children he refilled the cranberry juice bottle from which he and appellee had been drinking, but refilled it "[w]ith more vodka." He estimated that when they took the bottle with them down to the pool area, its contents were more vodka than cranberry juice. Mitchell testified that he later received a text message from appellee stating that, referring to the cranberry juice bottle, "I chugged it."

Mitchell admitted on cross-examination, however, that a handwritten statement he gave to the Allen Police on April 23, 2014, at 12.45 p.m., said nothing about appellee having taken a Xanax before picking up her children. In the written statement, Mitchell also said he had "some Advil/Advil PM" and that he told appellee to take two or four because she had complained of a headache, but Mitchell was not sure which bottle she took the pills from. In his trial testimony, Mitchell denied he had given appellee any Advil PM.

C.C. testified that Mitchell stayed with them at the pool area only a few minutes. When he left, appellee, the two children, and some strangers C.C. did not know were the only people there. The two children swam on their own while appellee sat at a nearby table smoking an e-Cigar. C.C. testified that while he and his sister swam on their own appellee left the pool area entirely, and left nine-year-old C.C. to supervise his four-year-old sister. C.C. also testified that appellee left and returned to the pool area several times while the children swam, leaving for up to twenty minutes at a time. No testimony was elicited as to the presence or absence of a

lifeguard. C.C. estimated he and his sister swam for approximately an hour and a-half, after which appellee told the children it was time to leave and took them back to her car. C.C. testified that his mother seemed "kind of woozy" and fell twice while walking to the car.

When they reached the car, appellee put B.C. in her car-seat and tried to buckle her in, but appellee was pressing the seatbelt into B.C.'s side and B.C. was "screaming and kicking" while she did so. Appellee passed out on top of B.C. C.C. testified that he started hitting her, telling his mother she was hurting B.C. Appellee awoke briefly and then passed out again on top of B.C. C.C. hit her again and appellee woke up, got up off of B.C., and "basically walked backwards like she couldn't control it, and then she fell down and didn't get up for a minute." C.C. texted his father a picture of appellee passed out on top of B.C., saying, "Something is wrong with my mom. Help. She hurting [B.C.]." That text message, a copy of which was admitted into evidence, shows it was sent at 2:39 p.m. Clampitt called C.C. to find out what was going on and, according to Clampitt's testimony, C.C. was hysterical and he could hear B.C. "screaming and crying" in the background. C.C. testified that appellee eventually stood up and got in the driver's seat of the car, put the keys in the ignition, and "kind of twisted" them. C.C. was unsure if she turned on the engine, but he recalled that he "could hear music." Appellee fell asleep on the steering wheel.

With C.C. still on the phone, Clampitt called the police. Officer Rich Adams of the Allen Police Department was the first officer on the scene. Appellee's car, a white Mercedes, was parked on the first level of a multilevel parking garage in the northwest portion of the Villages, a shopping center near the Marriott Hotel. The traffic outside was, Officer Adams recalled, "pretty heavy" that day. He found appellee passed out behind the steering wheel with her chin resting on her chest; her eyes were shut. The officer yelled at appellee and shook her arm but she did not wake up. He had to administer a sternum rub "just to inflict some sort of stimulus to wake

her," and when he pulled her head back "she came to and her eyes opened a little bit." But appellee then closed her eyes and passed out again, resting her chin on her chest. The officer continued yelling at appellee to wake up; she was unresponsive. When she eventually opened her eyes and looked up at the officer, he observed vertical nystagmus, an involuntary jerking of the eyes, and he could smell a mild odor of an alcoholic beverage on appellee's breath when she spoke.

Another Allen police officer, Alex Jones, testified that when the officers helped appellee out of her car she was very unsteady on her feet, swayed back and forth as she spoke to an officer, and had slurred, unintelligible speech. Officer Jones testified that when one of the officers asked appellee if she realized the gravity of her situation, she laughed. According to the officers' testimony, appellee never claimed to have a concussion or a head injury. They also noted that she refused medical treatment. Appellee was arrested for public intoxication. Officer Jones recalled that appellee had to be helped to the police car because she could not walk on her own.

Officer Adams testified that he found a sixty-four ounce bottle of Ocean Spray diet cranberry juice in appellee's car. The bottle had only a small amount of liquid in it, roughly two ounces according to Officer Jones's testimony. Officer Adams testified that he opened the bottle and smelled alcohol. Officer Jones said that when he smelled the liquid "it was consistent with the smell of vodka." He asked appellee if she would submit to a portable breath test, which would measure her blood alcohol content, and she refused. Officer Adams recalled that when appellee's mother arrived to take custody of the children—the police would not allow Mitchell to take custody because he was not a family member—she said that appellee may have taken Xanax and that she knew not to mix it with alcohol.

Officer Adams believed appellee was impaired and intoxicated and that she was

"absolutely not" in a position to drive a vehicle or supervise children. He also believed that, based on the condition he found appellee in, the children were in imminent danger. Officer Jones agreed appellee was impaired and testified that she was not capable of adequately supervising her children and that she had placed them in imminent danger of bodily injury by leaving them unattended at the swimming pool. Detective Joe Anders of the Allen Police Department, assigned to the Collin County Child Abuse Task Force, likewise testified that after reviewing the case and putting it together, he believed B.C. and C.C. were in imminent danger of death or bodily injury, or physical or mental impairment.

Appellee testified that she drank only half of a "hotel room glass" of "diluted cranberry juice with vodka" because she was "not a fan of liquor," and she denied taking Xanax before leaving the hotel and going down to the pool. Appellee testified she had a "pounding headache" that day and had been having severe headaches for much of the previous week, so she asked Mitchell—who had been in a motorcycle accident and, appellee believed, would have access to prescription pain medication—for some prescription strength Advil and took the pills he gave her. She trusted Mitchell and did not check to see what he gave her, but she believed it was the pills, not alcohol, that caused her condition. Appellee testified that she never left B.C. alone at the pool and that C.C. was alone for only a few minutes while she took B.C. to the bathroom. She also testified that she asked another woman who she had been talking to at the pool if she would watch C.C. for her and the woman replied, "Of course." After B.C. went to the bathroom, they returned to the pool and appellee got in the hot tub. Appellee recalled that she felt okay for the next thirty to forty-five minutes, but then she "started feeling weird" and told the children it was time to go. They started walking to the car. She testified that she wanted to get her children out of the pool area because B.C. "was not a strong swimmer" and appellee did not want to leave her children unsupervised "if something were to happen to me." Appellee remembered telling

C.C. to call appellee's mother, intending to wait in the car until she arrived. But appellee testified that she "blacked out" after that, and the next thing she remembered was being "yelled at" by a police officer.

Appellee attributed her behavior that day to the medication given to her by Mitchell—she claimed he lied about what he gave her at the hotel because he had wanted her to be his girlfriend and she preferred a platonic relationship—and the effects of a concussion. She testified that she had been assaulted in Oklahoma the week prior to this incident by a man she identified as Joe, an ex-boyfriend. Appellee's mother, Marilyn Brown, testified that she had been trying to get her to go to the hospital because she was concerned her daughter might have suffered a head injury because of the assault, but appellee delayed getting medical treatment. After appellee was released from jail, she went to the hospital, at her mother's insistence, and was diagnosed with post-concussion syndrome and a fractured vertebrae in her neck. However, Brown and appellee also acknowledged that appellee had a congenital defect in her neck that made it more vulnerable to injury. Appellee's medical records, introduced at trial, state that the neck injury was probably attributable to an older, unhealed fracture that predated the assault. The medical records include a progress report from appellee's physician dated March 14, 2014, less than two weeks after appellee's arrest, which states in part:

> We had a discussion about her injuries. She has no clear-cut history of a major trauma that could have caused a cervical fracture in the past. She does say that she has had abuse for the last year but does not have a specific neck injury that she can recall. She denies any weakness or numbness.

An April 8, 2014 progress report from appellee's physician contains the following statement: "I don't think that the fracture was caused by this most recent assault. This is likely an old, unhealed fracture that is older than the assault or it could be an os odontoideum. However, it was unstable based on the flexion and extension images that were reviewed with radiology preoperatively." Another progress report dated April 15, 2014, includes the following:

She brought with her some films from 2012. This fracture or abnormality was noted on studies at that time. I actually reviewed flexion and extension films. I can not [sic] measure exactly but it does appear on the studies to be unstable as well. Obviously, this is something that preexisted her most recent trauma. I still feel that this was likely an os odontoideum that had more than 7 mm of movement on flexion and extension.

Appellant cites the court of criminal appeals' definition of "imminent" in *Garcia v. State*, 367 S.W.3d at 689, as "ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near." She argues the evidence was insufficient to conclude she placed B.C. in imminent danger of death, bodily injury, or physical or mental impairment because no testimony was elicited as to what imminent danger, if any, was present at the pool; and no testimony was offered as to what imminent danger, if any, was present in the parking garage.

The determination of whether a child is in imminent danger has always been a fact-intensive inquiry. *See Mayberry v. State*, 351 S.W.3d 507, 510 (Tex. App.—San Antonio 2011, pet. ref'd). In *Garcia*, a mother was holding her two-year-old child outside in a parked, unlocked car, with no heat, in 58-degree October weather. *Garcia*, 367 S.W.3d at 685–66. The evidence showed the child was wearing only a very wet diaper, her skin was cold to the touch, her lips were blue, she was shivering and had a runny nose, and she did not stop shivering until she sat in front of a car heater for almost thirty minutes. *Id*. The court of criminal appeals determined there was no proof of bodily injury or physical impairment and no evidence the child was in imminent danger of bodily injury or physical or mental impairment. *Id*. at 689. The court specifically noted that the police officer testified that he did not believe the child needed medical attention, but he "knew if something wasn't done at the point that we were at, that it could turn for the worse and the infant would need to seek medical attention." *Id*. He never testified, however, that he believed the child was in imminent danger of physical pain or impairment. *Id*. "At most, he said it 'could' have turned for the worse, suggesting a possibility of an occurrence rather than an imminent danger of it." *Id*.

–9–

In *Millslagle*, a father left a young boy alone in a car while the father went into a sandwich shop. *Millslagle*, 81 S.W.3d at 896–97. Inside the shop, the father went in the bathroom and crawled into the ceiling of the shop, where he ingested methamphetamine. *Id*. A worker notified the police after she noticed an unattended child "jumping around" in a vehicle. *Id*. at 898. Police officers came to the aid of the boy and located his father thirty minutes later. *Id*. The father told officers he had used methamphetamine. *Id*. at 897. The Austin Court of Appeals held the evidence was legally insufficient to support a finding that the child was placed in imminent danger by being left alone in the vehicle. *Id*. at 898. The court stated:

> Although appellant's drug use may have carried with it the potential for danger should he return to the truck and drive away in an intoxicated state, appellant's drug use did not expose his child to imminent danger so long as appellant remained in the restroom and did not return to his truck.

*Id*. But, the court's decision turned on the fact the father did not use drugs in front of the child and that he did not attempt to drive the vehicle after using the drugs. *See id*.

In other cases, courts have found imminent danger. In *Mayberry*, the court of appeals concluded that the evidence was sufficient to show imminent danger because the defendant allowed her fifteen-year-old, unlicensed son to drive alone at night in a vehicle without enough safety belts for all of the children inside. *Mayberry*, 351 S.W.3d at 510. The evidence showed the vehicle was traveling over 100 miles per hour when it crashed through a fence and landed in an empty pond, and that Mayberry's son was the only child in the car wearing a safety belt. *Id*. In *Franklin v. State*, No. 11–13–00013–CR, 2015 WL 730075, at *2 (Tex. App.—Eastland Feb. 19, 2015, no pet.) (not designated for publication), the court found the evidence sufficient where the defendant dangled his infant son over a third-story balcony even though the child did not fall. The court specifically noted that the testimony was conflicting regarding appellant's conduct in holding the child over the balcony and it was within the factfinder's province to resolve the conflicts in the evidence. *Id*. In *Teeter v. State*, No. 05–06–00309–CR, 2007 WL 510356, at *6–

–10–

12 (Tex. App.—Dallas Feb. 20, 2007, no pet.) (not designated for publication), an intoxicated school bus driver drove at a high rate of speed, went off the road, crossed the center line, swerved from side-to-side, and nearly "flipped" the bus while turning without slowing. In *Suarez v. State*, No. 05–03–00096–CR, 2003 WL 23025024, at *3–5 (Tex. App.—Dallas Dec. 30, 2003, pet ref'd.) (mem. op., not designated for publication), the defendant allowed his three-year-old child to remain unrestrained in a moving vehicle, and the child fell out of the front passenger window. In *Perez v. State*, No. 05–99–00830–CR, 2000 WL 1716517, at *2 (Tex. App.—Dallas Nov. 17, 2000, no pet.) (not designated for publication), the defendant was found unconscious in a parking lot next to a vehicle with the door open, a four-month-old baby was found inside the vehicle, and upon awakening the defendant appeared intoxicated and incoherent, and did not know his identity.

Other courts have found imminent danger where the defendant left dangerous items such as handguns, knives, syringes, and drugs within access of an unsupervised child. *See Flores v. State*, No. 13–12–00567–CR, 2013 WL 3378328, at *4 (Tex. App.—Corpus Christi–Edinburg July 3, 2013, no pet.) (mem. op., not designated for publication) (cocaine left in plain view throughout apartment); *Manning v. State*, No. 05–11–00867–CR, 2013 WL 1819982, at *2 (Tex. App.—Dallas Apr. 30, 2013, no pet.) (mem. op., not designated for publication) (loaded, unsecured handguns and cocaine and marijuana); *Butler v. State*, No. 14–09–00067–CR, 2010 WL 547055, at *4 (Tex. App.—Houston [14th Dist.] Feb. 18, 2010, no pet.) (mem. op., not designated for publication) (bag of cocaine and bag of marijuana were in vehicle with unrestrained children when defendant stepped out to talk with officer); *Anguiano v. State*, No. 08–02–00443–CR, 2004 WL 178601, at *4 (Tex. App.—El Paso Jan. 29, 2004, pet. ref'd) (mem. op., not designated for publication) (loaded syringe left within reach of child strapped in car-seat while defendant passed out in driver's seat); *Harrist v. State*, Nos. 11–01–0009394–CR, 2002

WL 32344342, at *2 (Tex. App.—Eastland Mar. 28, 2002, no pet.) (not designated for publication) (six-year-old child with Down syndrome twice crossed busy street while defendant slept in motel room; knives, syringes and pill bottles strewn about table and floor of motel room).

The evidence in this case is sufficient for the jury to have concluded appellee placed B.C. in imminent danger of death, bodily injury, or physical or mental impairment. There is evidence from which a jury could have found that appellee left the pool area several times for up to twenty minutes at a time, leaving four-year-old B.C. with only her nine-year-old brother to supervise her. Appellee denied she left B.C. unattended at the pool and that when she briefly left the pool area she asked another adult to look after C.C., but the jury, in its role as the sole judge of the weight and credibility of the evidence, could have chosen not to believe that testimony. The fact-finder may choose to believe all, some, or none of the testimony presented. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). The jury could have found that leaving B.C., a four-year-old child who, as appellant testified, "was not a strong swimmer," at a swimming pool without adult supervision placed the child in imminent danger. She could have drowned or been otherwise injured. In *Manning* and other cases, this Court and others concluded that leaving dangerous items such as weapons or drugs within access of an unsupervised child places the child in imminent danger. *See, e.g., Manning*, 2013 WL 1819982, at *2. The jury could have reasonably concluded that leaving a four-year-old child within access of a swimming pool, and in the water itself, without adult supervision placed the child in imminent danger.

The evidence also showed that, after leaving the pool, appellee fell twice while taking her children to the car, passed out on top of B.C. while buckling the child into her car-seat, fell again, got into the driver's seat, placed the keys in the ignition, "kind of twisted" them, and then fell asleep. There was evidence appellee pressed the seatbelt into B.C.'s side while buckling the child in to such an extent that it caused her to scream and kick. C.C. became so concerned he

–12–

started hitting appellee, telling her she was hurting B.C. C.C. was unsure if appellee turned on the engine, but he recalled that he could hear music. The jury could have reasonably concluded that appellee attempted to operate the vehicle while impaired and that it was only C.C.'s call for assistance and the removal of the keys from the ignition that prevented appellee from operating the vehicle.

The steps appellee took to operate the vehicle distinguish this case from others such as *Millslagle* and *Garcia* where courts found the danger was not imminent. In *Millslagle*, for example, the defendant was intoxicated but did not return to the truck and the keys were not in the ignition—two facts noted by the court in determining there was no imminent danger. *See Millslagle*, 81 S.W.3d at 898–99. In this case, however, appellee sat in the driver's seat of the car, put the keys in the ignition, and "kind of twisted" the key before falling asleep. Appellee showed a persistence in attempting to operate the vehicle, falling several times and passing out twice before getting into the driver's seat and putting the keys in the ignition. The evidence reveals an imminence to the danger that was simply not present in *Millslagle*, where the defendant remained in the sandwich shop's restroom and gave no indication of returning to the truck where his child awaited. *See id.* Furthermore, unlike in *Garcia*, there was testimony in this case that B.C. was in imminent danger. Officer Adams, Officer Jones, and Detective Anders all testified that appellee's actions placed B.C. in imminent danger of death, bodily injury, or physical or mental impairment. The *Garcia* court specifically stated in finding the evidence insufficient that the police officer never testified that there was imminent danger, only the possibility of it. *Garcia*, 367 S.W.3d at 689. The jury in the present case was free to consider the testimony of these witnesses in determining whether the danger was imminent.

The jury could have likewise concluded appellee acted with the requisite mental state. The State presented evidence appellee took a Xanax and subsequently drank alcohol, despite

–13–

being aware of the danger of mixing Xanax and alcohol. Appellee's friend, Ben Mitchell, testified that he warned appellee not to drink alcohol and that the alcohol "was for me really, not for [appellee] to consume with the kids." Appellee attributed her conduct to the effects of a concussion and the medication given to her by Mitchell, but the jury, in its role as the sole judge of the weight and credibility of the evidence, was free to disbelieve appellee's explanation. *See Chambers*, 805 S.W.2d at 461. Additionally, appellee's medical records ascribed her neck injury to an older, unhealed fracture that predated the assault. Looking at the evidence in the light most favorable to the verdict, a rational jury could reasonably conclude appellee intentionally, knowingly, recklessly, or with criminal negligence placed B.C. in imminent danger of death, bodily injury, or physical or mental impairment.

In its brief, the State refers to a statement made by appellee at the hearing on the motion for new trial that the evidence is insufficient in this case because the jury found appellee not guilty of endangering C.C. on the same evidence used to support the conviction for endangering B.C. Appellee does not address this argument in its brief. We, however, do not find these verdicts inconsistent. C.C. testified at trial. The evidence showed him to be an intelligent, level-headed nine-year-old fifth grader who acted maturely during a stressful situation. In contrast, B.C. was four years old and completely dependent on those around her. The jury was entitled to view the two crimes independently. We examine the sufficiency of the evidence to support the verdict rather than speculate on how the jury arrived at its verdict. *See United States v. Powell*, 469 U.S. 57, 64 (1984); *Jackson v. State*, 3 S.W.3d 58, 61–62 (Tex. App.—Dallas 1999, no pet.); *Crawford v. State*, No. 05–12–01072–CR, 2013 WL 3554307, at *4 (Tex. App.—Dallas July 11, 2013, pet. ref'd) (not designated for publication).

We therefore conclude the trial court abused its discretion by granting appellee's motion for new trial based on insufficient evidence, and we sustain the State's issue. We vacate the trial

court's June 22, 2015 order granting appellee's motion for new trial and reinstate the judgment of conviction and sentence.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
150901F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-15-00901-CR     V.

ANGELA DAWN CLAMPITT, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas

Trial Court Cause No. 380-81729-2014.

Opinion delivered by Justice Myers. Justices Francis and Lang-Miers participating.

Based on the Court's opinion of this date, we **VACATE** the trial court's June 22, 2015 order granting appellee Angela Dawn Clampitt's motion for new trial. We **REINSTATE** the judgment of conviction and sentence.

Judgment entered this 15th day of July, 2016.